Janice B. THOMAS, Plaintiff,

v.

GULF HEALTH PLAN, INC., et al., Defendants.

Civ. A. No. 88–0265–BH–M.

United States District Court,
S.D. Alabama, S.D.

June 15, 1988.

J. Edward Thornton, Bert S. Nettles and Forrest S. Latta, Mobile, Ala., for Blue Cross–Blue Shield of Alabama.

## ORDER

HAND, Chief Judge.

This cause came on for trial before the Court on May 31, 1988. Plaintiff originally filed this action in the Circuit Court of Mobile County, Alabama, seeking an injunction to prohibit defendants from denying certain health insurance benefits under an employee welfare benefit plan as to which she is a participant. In addition, plaintiff set forth in her complaint various state law causes of action in tort and contract for damages beyond the alleged benefits due. The case was properly removed to this Court pursuant to 28 U.S.C. §§ 1331 and 1441(b). Removal was predicated upon the fact that the employee welfare benefit plan at issue is governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, and that plaintiff's state law claims are preempted by ERISA. Subsequent to the removal, defendants Employees' Health Benefit Plan for Employees of Gulf Health, Inc. and Infirmary Health Systems, Inc. as Administrator moved the Court, *inter alia,* to strike from the complaint claims for damages other than benefits due under the employee benefit plan at issue. This motion to strike was granted by order entered April 29, 1988. The case, therefore, proceeded to trial on plaintiff's claim for benefits under the employee welfare benefit plan which is governed by ERISA.

The Court has considered the pleadings, the testimony of the witnesses, the documents and other evidence of record and, being otherwise fully advised in the premises, hereby makes the following Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure.

## I. *Findings of Fact*

1. At all material times, plaintiff, Janice B. Thomas, has been an employee of Mobile Infirmary, where she is an insured beneficiary of an employee benefit insurance plan

John L. Lawler, Mobile, Ala., for plaintiff.

Wade B. Perry, Jr. and Celia J. Collins, Mobile, Ala., for Gulf Health Plan, Inc. and Employees' Hospitalization Plan–Gulf Health, Inc.

known as the Employees' Health Benefit Plan for Employees of Gulf Health, Inc. ("the plan"), an "employee welfare benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*

2. Defendant Infirmary Health Systems, Inc. (IHS), as successor by name change to Gulf Health, Inc. (Gulf Health), is the plan administrator and defendant Blue Cross and Blue Shield of Alabama (Blue Cross) is the claims administrator for the plan.

3. In February of 1984, plaintiff was diagnosed as having breast cancer. According to the deposition testimony of plaintiff's oncologist, Michael Meshad, M.D., plaintiff initially underwent only surgery because additional therapy was not then deemed necessary. (Meshad Deposition at p. 9, 11. 3–5). At some unspecified point in time following her surgery, plaintiff developed a node on her chest wall which was biopsied and diagnosed to be recurrent cancer. (Id. at 11. 5–9). A chest x-ray then revealed "pulmonary nodules which were presumed to be metastastic disease." (Id. at 11. 9–11). With respect to treatment from that point, plaintiff was started on chemotherapy. (Id. at 1. 14). After receiving "six cycles" of one form of chemotherapy, plaintiff was then switched to and received two cycles of a more toxic form of chemotherapy. (Id. at 1. 16–23). Upon determining that there was "not much in the way of response" to this chemotherapy treatment, Dr. Meshad referred plaintiff to Vanderbilt University Medical Center (Vanderbilt) for additional consultation and bone marrow harvesting. (Id. at 1. 23 and p. 10, 11. 1–3; Agreed Fact No. 3).

4. Bone Marrow harvesting sometimes is performed prior to significant chemotherapy in order that "pure" marrow will be available in the event conventional chemotherapy fails and high dose chemo-

therapy and bone marrow transplantation is performed. (Agreed Fact No. 4). As specifically discussed by Dr. Meshad in his deposition, the physicians at Vanderbilt believed "it would be appropriate at that point to harvest [plaintiff's] bone marrow in the thought that if conventional chemotherapy proved less than effective that at some point in time high dose chemotherapy could be given with bone marrow rescue." (Meshad Deposition at p. 10, 11. 21–23 and p. 11, 1–2).[1]

5. Plaintiff was hospitalized at Vanderbilt from the afternoon of October 7, 1986 through the morning of October 9, 1986 for the bone marrow harvesting procedure. Before plaintiff's hospital admission for the bone marrow harvesting procedure, coverage was precertified by defendant IHS, formerly Gulf Health, as "medically necessary" in accordance with the following provisions of the plan:

■ SECTION III—BENEFITS.

Subject to all other provisions of the plan, benefits under this Plan for services, care, treatment or supplies shall only be available to a Member on the condition that the services, care, treatment, or supplies

(i) are determined by the administrator or P.P.O. Mobile to have been Medically Necessary whether such determination is made before the services are rendered … while the services are being rendered … or after the services have been rendered;

■ SECTION V—LIMITATIONS AND WAITING PERIODS

(A) *Basic Coverage*

5. *Preadmission Review and Certification of Inpatient Hospital Services Benefits*

To be eligible for Inpatient Hospital Service Benefits, all Inpatient Hospital admissions and stays … must be reviewed, approved, and certified by P.P.

---

1. According to Dr. Meshad, the rationale underlying this treatment regime is that, although conventional chemotherapy is limited by bone marrow toxicity to the drugs administered, bone marrow harvesting permits the administration of a large does of chemotherapy which is lethal

to the bone marrow and then, after the drug has cleared from the body, the reintroduction of bone marrow never exposed to the large does of chemotherapy. (Meshad Deposition, p. 11, 11. 14–23 and p. 12, 11. 1–7).

O. Mobile as being Medically Necessary *before* the Member is admitted to the Hospital.

(Defendant's Exhibit #2 at pp. 8 and 20). The plan defines "Medically Necessary" as "the use of a Hospital or the furnishing of other services or supplies which are necessary to treat a Member's illness or injury." (Defendant's Exhibit #2 at p. 3). The plan further provides, however, that "[t]o be Medically Necessary, the services and supplies furnished must (as determined by the Administrator) . . . not be Experimental or Investigative." (Id.)[2]

6. Upon plaintiff's admission to Vanderbilt Medical Center in October 1986, it was disclosed to her that autologous bone marrow transplantation for treatment of breast cancer still was considered "investigatory". She signed a consent to treatment containing that disclosure, which consent form also stated:

At this time, your consent is being obtained only for the removal, freezing and storage of the bone marrow. This consent is *not* for higher dose therapy. At the time that high-dose therapy may be recommended, you will be asked to read and sign another form which tells about the high-dose treatment. Having your bone marrow collected does not mean that you will have to undergo high-dose therapy.

(Agreed Fact No. 5). It is undisputed that autologous bone marrow transplantation for the treatment of breast cancer is still considered experimental or investigative, even though such treatment is no longer considered experimental by Blue Cross for certain other types of cancer. (Agreed Fact No. 9).[3]

7. Subsequent to the bone marrow harvest, plaintiff submitted a claim for the Vanderbilt medical expenses to Blue Cross. The claim was originally denied on the ground that the non–PPO physician and facility had not been approved. Upon Gulf Health's approval of the physician and facilities the claim was paid in full without further review.

8. Following the bone marrow harvest, plaintiff underwent further conventional chemotherapy treatment in Mobile until, according to Mr. Meshad, a point was reached "where there [was] no standard chemotherapy left." (Meshad Deposition at p. 14, 11. 3–4). On February 1, 1988, Dr. Meshad advised the plaintiff to return to Vanderbilt for high-dose chemotherapy followed by autologous bone marrow transplantation, which involves transplanting the bone marrow harvested in 1986. (Agreed Fact No. 8; Blue Cross Exhibit #2).[4]

9. Upon the request for precertification under the plan for the high-dose chemotherapy treatment and the autologous bone marrow transplantation at Vanderbilt, both Vanderbilt and the plaintiff were advised that precertification and coverage for this

2. The plan itself excludes coverage for experimental or investigative treatments or procedures as follows:

SECTION IV—EXCLUSIONS
A. *Basic Coverage*
No benefits shall be provided under Section III.A. or Section III.C. hereof with respect to the following, whether or not recommended or prescribed by a physician.

. . . . .

10. Any treatment or procedure, medical or surgical, or any facilities, drugs, drug usage, equipment, or supplies which are Experimental or Investigative.

. . . . .

(Defendant's Exhibit #2 at pp. 22–23).

3. Dr. Patrick Earl Ryce, Vice–President and Medical Director of Blue Cross, testified that in February of 1988 the medical review committee of Blue Cross recommended, based on their study of the matter, that autologous bone marrow transplantation no longer classified experimental or investigative in connection with certain stages of Hodgkin's disease, neuroblastoma, acute lymphocytic and acute non-lymphocutic leukemia.

4. In a letter written by Dr. Meshad on February 1, 1988 to a Dr. Dodd Ozment, Dr. Meshad stated, with regard to the plaintiff's treatment:
I feel that conventional chemotherapy offers no real hope for major benefits. I have therefore recommended that we either discontinue treatment or proceed with an experimental treatment such as high dose chemotherapy with autologous bone marrow rescue. She will consider her options and let me know. (Blue Cross Exhibit #2).

treatment program would be denied.[5] Defendants advised plaintiff that this treatment program was still considered experimental or investigative and thus not covered by the plan.

10. The plaintiff contends that the high-dose chemotherapy treatment with autologous bone marrow transplantation is merely the second phase of a total treatment program which included, as the first phase, the bone marrow harvesting and that she would not have undergone the harvesting procedure had she known the entire treatment program would not be covered under the plan. The evidence establishes, however, that at the time plaintiff underwent the bone marrow harvesting, there existed no certainty that the high-dose chemotherapy and bone marrow transplantation would be performed. According to Dr. Meshad, the harvesting procedure was performed to insure that in the event, and only in the event, conventional chemotherapy failed, plaintiff's option to undergo experimental treatment involving high-dose chemotherapy with bone marrow transplantation would not be foreclosed. See, Finding No. 4, *supra.* In addition, the consent form signed by the plaintiff prior to bone marrow harvesting clearly indicated that the harvesting did not mean that she would in fact undergo high-dose chemotherapy treatment. *See,* Finding No. 6, *supra.* Finally, it is uncontroverted that precertification is required under the plan for each hospital admission which, therefore, negates any possible reliance upon the precertification of a prior hospital admission, whether or not made in error, relative to a question regarding coverage of a subsequent admission.

11. In January 1988, Gulf Health did direct Blue Cross to pay a claim of another participant under the plan (Jane Doe) which Blue Cross had rejected because, according to its records, the treatment for which payment was claimed was provided for a condition which pre-existed the participant's employment and the waiting period for such pre-existing conditions had not been satisfied. The evidence establishes, however, that Jane Doe had been employed and covered by the plan initially from 1983 through December 1987, had resigned for a period of two months and then had become re-employed in March 1987. In addition, not only had Jane Doe's hospitalization been pre-certified, but coverage had been verified prior to hospitalization and treatment and the treatment in question was in fact covered under the terms of the plan. Gulf Health's decision to make an exception, therefore, was based on the perception that, under the circumstances, the exception constituted no more than waiving certain time limitations, to-wit: the waiting period for pre-existing conditions. The plan provides, however, that:

SECTION V—LIMITATIONS AND WAITING PERIODS

2. *Pre–Existing Conditions*

Benefits of Basic Coverage under Section III.A. shall not be available to any member for any condition ... disease, disorder or ailment ...

(i) which existed on or before the Member's Effective Date, whether then manifested or known in any way or not, or

(ii) for which medical or surgical treatment, advice, or diagnosis has been rendered or received within one year prior to the Member's Effective Date, unless and until [member meets certain requirements including a waiting period of 270 days].

(Defendant's Exhibit # 2 at pp. 19–20).

12. The Court does not question by any means the emotional distress experienced by the plaintiff upon discovery that the conventional chemotherapy she has undergone has failed her. Nor does the Court

---

**5.** It is uncontroverted that, upon plaintiff's request for precertification in February 1988, defendant Gulf Health requested information regarding the procedure from plaintiff's Vanderbilt physician and thereafter forwarded this information to its medical director, Dr. Patrick Ryce, for review. (Agreed Fact No. 11). Dr. Ryce testified that, after review of the information provided to him, he, as medical director of Blue Cross, made the decision to deny coverage to the plaintiff for this treatment because the plan excluded experimental or investigative procedures.

question the financial burden that will be imposed upon the plaintiff if the coverage at issue is denied. The sympathy the Court indeed feels, however, does not and cannot alter the fact that the treatment sought to be covered under the plan is clearly experimental and that, as such, it is specifically excluded under the terms of the plan.

## II. *Conclusions of Law*

1. This Court has jurisdiction over the subject matter of this litigation and over the parties pursuant to 29 U.S.C. § 1001 *et seq.* and 28 U.S.C. §§ 1331 and 1441(b).

2. This action involves claims for benefits under the Employee Health Benefit Plan for Employees of Gulf Health, Inc. (the plan). The action is governed, therefore, by ERISA, 29 U.S.C. § 1001 *et seq.*, and all state law claims and causes of action are pre-empted by ERISA. *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed. 2d 55 (1987); *Belasco v. W.K.P. Wilson & Sons, Inc.*, 833 F.2d 277 (11th Cir.1987).

3. The standard which this Court must apply under ERISA when reviewing defendants' denial of benefits in this matter is well settled. The plan administrator's decision to deny benefits must be upheld unless such decision was arbitrary and capricious. As stated in *Anderson v. Ciba-Geigy Corp.*, 759 F.2d 1518 (11th Cir.), *cert. denied*, 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985):

> Under that highly deferential standard of review, this Court's role "is limited to determining whether [the administrator's] interpretation was made rationally and in good faith—not whether it was right."

759 F.2d at 1522, quoting *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 825 (11th Cir.), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3514, 82 L.Ed.2d 823 (1984). *See also, Sharron v. Amalgamated Insurance Agency Services, Inc.*, 704 F.2d 562, 564 (11th Cir.1983); *Dennard v. Richards Group, Inc.*, 681 F.2d 306, 313–14 (5th Cir. 1982); *Fulmer v. Connors*, 665 F.Supp. 1472, 1488–90 (N.D.Ala.1987).

4. In conjunction with the application of the arbitrary and capricious standard, certain factors have been identified as appropriate for consideration. The factors which can fairly be said to be appropriate for consideration in this case include: (1) uniformity of construction; (2) "fair reading" and reasonableness of that reading; (3) internal consistency of a plan under the interpretation given by the administrators; and (4) factual background of the determination by a plan and inferences of lack of good faith, if any. *See, Anderson, supra,* 759 F.2d at 1522, adopting the factors as originally set forth in *Dennard, supra,* 681 F.2d at 314. *See also, Fulmer, supra,* 665 F.Supp. at 1489–90.

5. As applied to the case at bar, it cannot be said that the actions of Gulf Health and Blue Cross were arbitrary and capricious. It is undisputed that, as relates to the treatment of breast cancer, high-dose chemotherapy with bone marrow transplantation is experimental and that the plan expressly excludes coverage for experimental or investigatory treatments and procedures. There is no evidence in this record to indicate that the exclusion relative to experimental procedures has been inconsistently applied.

6. Plaintiff's only argument is that Blue Cross and/or IHS, formerly Gulf Health, should be estopped by their conduct from refusing to pay for high-dose chemotherapy with autologous bone marrow transplantation, notwithstanding the experimental nature of the treatment. Plaintiff's argument is predicated first upon the defendants' act of pre-certifying her admission for the bone marrow harvesting procedure, and then upon an exception made by Gulf Health relative to another plan participant. As pointed out by the defendants, however, there are major impediments to plaintiff's recovery under a doctrine of estoppel. First, it is now abundantly clear that ERISA preempts state common law doctrines, including that of estoppel. *Nachwalter v. Christie*, 805 F.2d 956, 959 (11th Cir.1986). Second, the Eleventh Circuit has held that an employee

benefit plan cannot, with the requirements of ERISA, be modified either by oral representations and agreements or by the use of informal written agreements. 805 F.2d at 960. Third, even if the doctrine was available, the facts in this instance would not support recovery based on estoppel. Notwithstanding the plan's precertification of and subsequent payment for the 1986 harvesting procedure, it is evident that high-dose chemotherapy with autologous bone marrow transplantation was, at the time of harvesting, strictly considered a future contingency to be used only in the event conventional chemotherapy failed. In addition, precertification is required under the plan for each hospitalization irrespective of its relation to an ongoing treatment program. There is simply no evidence that, by precertifying and paying for the harvesting procedure, whether or not in error, defendants intended to lead plaintiff to believe that high-dose chemotherapy with autologous bone marrow transplantation would be covered.[6]

■ 7. To the extent plaintiff argues that the exception made by Gulf Health in January 1988 for Jane Doe estops this defendant from denying coverage to the plaintiff, such argument must fail. The Court would agree that no real distinction exists between a time limitation relative to pre-existing conditions and an exclusion for experimental treatments or procedures because, in both instances, benefits are not available under the plan. *See,* Finding No. 11. The error, if any, of Gulf Health in waiving the time limitation for Jane Doe

cannot, however, constitute grounds for enjoining defendants from denying coverage to the plaintiff.[7] This Court must agree that neither the plan nor its administrator should be held perpetually liable to other plan participants as a result of a single inconsistent application of the terms of the plan by Gulf Health. *See, e.g., Henne v. Allie-Chalmers Corp.,* 660 F.Supp. 1464, 1480 (E.D.Wis.1987). Even if the Court considered the error relative to Jane Doe in combination with the apparent error in pre-certifying plaintiff for the bone marrow harvesting procedure, such would not constitute sufficient internal inconsistency to either intimate bad faith or justify enjoining defendants from denying the coverage now sought by the plaintiff.

## CONCLUSION

High-dose chemotherapy with autologous bone marrow transplantation is experimental and expressly excluded from coverage under the Employee Health Benefit Plan for Employees of Gulf Health, Inc. The administrator would not be fulfilling his fiduciary duty to expand the terms of coverage provided by the plan. The decision to enforce the terms of the plan and, accordingly, to deny coverage for the experimental treatment contemplated by the plaintiff was rational and supported by the evidence before him. Consequently, the decision to deny coverage must be upheld.

It is, therefore, ORDERED, ADJUDGED and DECREED that judgment be entered in favor of the defendants and against the

6. Although the Court recognizes that, in *Nachwalter v. Christie,* 805 F.2d 956 (11th Cir. 1986), the Eleventh Circuit proscribed estoppel by oral representations or informal written agreements under the circumstances presented to it, this Court nonetheless believes that there may exist circumstances, particularly in the medical benefits area, where a plan or its administrator may be estopped to deny coverage. For example, if Gulf Health in this case had failed to pay for the bone marrow harvesting procedure after having pre-certified that it was medically necessary, this Court would have felt constrained to require payment for that procedure because, contrary to defendant's characterization, a precertification as to medical necessity includes a finding that the procedure is not experimental. *See,* Defendant's Exhibit # 2 at p.

3. The plaintiff, for purposes of the harvesting procedure alone, appropriately relied upon the precertification for that procedure, notwithstanding Gulf Health's apparent error in precertifying it.

7. In this Court's opinion, the precertification and verification of coverage given to Jane Doe prior to her hospitalization and treatment and the fact that Jane Doe relied and acted upon same may have constituted grounds to estop defendants from later denying coverage to Jane Doe. Such would be the limited kind of circumstance in which this Court believes estoppel may be applicable. For the reasons stated previously, however, plaintiff's situation is distinguishable. *See, e.g.,* n. 6, *supra.*

plaintiff. It is FURTHER ORDERED that in this case no costs are to be taxed.