Vivion McRAE and Paulette McRae, Plaintiffs,

v.

SEAFARERS' WELFARE PLAN, Defendants.

Civ. A. No. 88–00544–T.

United States District Court, S.D. Alabama, S.D.

Dec. 4, 1989.

Thomas E. Sharp, III, J. Burriss Riis, Mobile, Ala., for plaintiffs.

John C. Falkenberry, Birmingham, Ala., for defendants.

## ORDER

DANIEL HOLCOMBE THOMAS, Senior District Judge.

The above styled case was set for trial on October 4, 1989. This Court has fully con-

sidered all pertinent materials in the file and hereby makes the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT.

1. At all material times, plaintiff, Vivion McRae, was an employee of Dravo Basic Materials, Co., where he and his dependents, specifically his wife, the Co-plaintiff, Paulette McRae, were insured beneficiaries of an employee benefit insurance plan known as Seafarers' Welfare Plan ("the Plan"), an "employee welfare benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.

2. Defendant, Seafarers' Welfare Plan is a multi-employer labor-management trust fund which is funded solely through contributions from employers who are signatory to collective bargaining agreements with the Seafarers' International Union ("SIU").

3. Seafarers' Welfare Plan is a self administrated plan which maintains a toll free telephone line through which, among other things, its beneficiaries may contact the Plan to verify health benefits and coverage under the Plan for specific medical procedures. The employees of the Plan who answer this telephone line are authorized to verify or deny coverage for medical treatment over the telephone.

4. In June of 1986, Mrs. McRae began seeing Dr. William Urquhart of Bay Area Physicians for Women in Mobile, Alabama. The sole reason that Mrs. McRae went to Dr. Urquhart was to obtain a Tubal Reanastomosis, which is a reversal of a previous surgical sterilization.

5. On June 23, 1986, Mr. McRae accompanied Mrs. McRae to Dr. Urquhart's office to discuss the Tubal Reanastomosis. During these discussions, the cost of this surgery was addressed. The McRaes could not afford this surgery unless it would be covered by their insurance. During these discussions, Dr. Urquhart directed the McRaes to his insurance clerk, Ann Lilly, and advised her to confirm whether a Tubal Reanastomosis would be covered under the McRaes' insurance plan. In the presence of the McRaes, Ms. Lilly called the toll free number of the Plan to confirm insurance coverage. She advised the answering party of Mr. McRae's social security number and place of employment and then inquired as to whether Mr. McRae's insurance would cover a Tubal Reanastomosis performed on his wife. Ms. Lilly explained the procedure involved in a Tubal Reanastomosis and she was asked to wait. After a brief delay, the party returned to the telephone and advised Ms. Lilly that the Plan did provide coverage and it would pay 80% of the medical cost of a Tubal Reanastomosis. Plaintiffs introduced a note written by Lilly and dated 6/23/86 which said, "Verified—tubal reversal paid @ 80%." Ms. Lilly's testimony was that she made the note contemporaneously with the telephone call to SWP on June 23, 1986. The entry she made in Dr. Urquhart's formal record said:

> 6–23–86 Surgery (Diagnostic Laparoscopy) scheduled @ Doctors 7–7–86 –7:30 PT. advised

Plaintiff, throughout the preparation of this case for trial, sought discovery of any records of the defendant which would confirm the fact that Ms. Lilly did use the 800 number in talking to defendant on June 23, 1986. Defendant in response to such discovery, denied having any evidence of such call having been made. On the day of the trial defendant offered its Exhibit No. 4 to which plaintiff objected as its having been filed too late and the Court reserved its ruling on the admissibility of such document. Such document verifies the fact that a call was made and will be, and is, admitted as evidence. A post-trial affidavit of Thomas Cranford was received days after both parties had rested and is admitted for whatever it is worth.

6. Mr. Thomas Cranford, the Plan's head administrator, who testified on behalf of the Plan during the trial of this matter, testified that a doctor and other individuals are available to assist the Plan personnel answering the telephones in making determinations as to coverage.

7. Ms. Lilly advised the McRaes and Dr. Urquhart that there was coverage based on

the verification received over the telephone. In reliance on this telephone verification, the McRaes went forward with scheduling the surgery with Dr. Urquhart.

8. A preliminary surgical procedure was performed on July 7, 1986. The expenses involved in this procedure were paid by the Plan and are not included in the medical expenses claimed by the McRaes in this lawsuit. While the Plan claims that this was the only procedure verified on June 23, 1986, this Court finds that the entire Tubal Reanastomosis was verified.

9. On August 4, 1986, Dr. Urquhart performed the Tubal Reanastomosis. The resulting expenses included anesthesia services at a cost of $700.00, two hospital charges, one of $3,112.03 and one of $142.06 and Dr. Urquhart's bill for $3,086.60. These bills and the reasonableness of their amounts were stipulated to by defendants.

10. On August 26, 1986, the anesthesia bill, which specifically stated that it was for a Tubal Reanastomosis, was processed and paid by the Plan. On August 26, 1986, the $3,112.03 hospital bill, which did not specifically state that it was for a Tubal Reanastomosis was processed and paid by the plan. On August 27, 1986, Dr. Urquhart's bill was processed *but* refused by the Plan. At that time, after plaintiffs had incurred all medical expenses in reliance upon the Plan's determination that the Tubal Reanastomosis was covered, the Plan reversed its previous determination regarding coverage. On September 22, 1986, the Plan sent reimbursement requests to the hospital and the anesthesia provider. The hospital returned the $3,112.03. The anesthesia provider did not make the refund.

11. Mr. Cranford testified that the denial of coverage was based on the following provision contained in the Plan Regulations:

2. Changes for medical care and treatment listed below will not be covered under the Major Medical Benefits provision, except to the extent provided:

.     .     .     .     .

g. Charges for services rendered for diagnostic purposes, except where nec-

essary for the treatment of an injury or sickness; *charges for elective services where there is no diagnosis of an injury or illness.* (Emphasis added).

The term "elective services" is not defined in these Regulations which are approximately 50 pages in length, nor is it defined in the 65 pages of assorted amendments to the Regulations which date back to 1976. These amendments have not been incorporated into the body of the Plan Regulations, but are simply attached at the end of the Regulations.

12. Amendment No. 18 to the Rules and Regulations of the Plan, amending Article 2, which does not contain the provisions referred to in Paragraph 10 above regarding "elective surgery", states as follows:

2. (III)

E. No benefits shall be paid for any treatments received which are not medically necessary. This exclusion includes but is not limited to cosmetic treatments. The following procedures are specifically excluded from coverage under this plan:

Gastroplasty

Gastric Bypass

Gastric Stapling

Breast Implant

Acne Surgery/Dermabrasion

Keratotomy

Orthotics

Rhinoplasty

Rhytidectomy

Lipectomy

Penile Implant/Prothesis

Gender Orientation

13. Although the McRaes had no copy of the Plan Regulations and Amendments to which they refer, it is apparent that they would have been incapable of making a determination as to coverage for a Tubal Reanastomosis by reviewing the Regulations.

14. The total amount of medical bills for which the McRaes became personally liable in reliance upon the Plan's determination of coverage was $6,340.69. The

McRaes are financially unable to pay these bills. As a result, they have been refused credit in efforts to make necessary purchases and they have been subjected to the constant harassment of collection agencies. (At the request of plaintiff's attorney the collection agencies have put their collection efforts on hold pending the resolution of this lawsuit.)

15. Mr. McRae learned of the Plan's change in position when collection efforts began against him personally for the outstanding bills. He attempted to have this refusal investigated through his job steward at Dravo, however, he received no results. The McRaes then had their attorney send letters directly to the Plan which prompted no response. Two such letters were sent and no response was ever received. In fact, after filing this lawsuit, additional letters were sent by McRaes' attorney to the Plan's attorney requesting reconsideration of the denial of coverage, which requests were denied.

16. The Plan Regulations do not specifically exclude Tubal Reanastomosis from coverage. On June 23, 1986, the McRaes were advised that the Tubal Reanastomosis was covered under the plan. The McRaes justifiably relied on that interpretation and incurred substantial expenses which they otherwise would not have incurred.

17. Where any findings of fact, in whole or in part, can be deemed a conclusion of law, it shall. Where any conclusion of law, in whole or in part, can be deemed a finding of fact, it shall.

## II. CONCLUSIONS OF LAW.

1. This Court has jurisdiction over the subject matter of this litigation and over the parties pursuant to 29 U.S.C. § 1001 et seq. and 28 U.S.C. § 1331.

### A. Exhaustion of Administrative Remedies.

■ 2. The Plan argues that this Court lacks subject matter jurisdiction in this case because plaintiffs have failed to exhaust administrative remedies. The "Appeal Procedure," provided for in the Plan's Regulations states that "(i)f an employee's application for benefits is denied, he shall receive a statement in writing, from the Plan indicating the reason for denial." Based on the documentary evidence presented during the trial of this matter and the oral testimony, it is apparent that no such notice was received by plaintiffs. The Plan's "Appeal Procedure" then provides that "any employee whose application is denied may have his case reviewed by the Trustees, or a committee of the Trustees designated to review such cases. Any employee's request for review must be made to the Plan in writing, written 90 days from the date he received notice that his application has been denied." As noted above, plaintiffs never received written notice of defendant's denial of their insurance coverage. Through their attorneys, however, plaintiffs did send several written requests for review to the Plan and have been afforded absolutely no administrative response. The two letters sent to the plan by plaintiffs' attorneys prior to filing this case satisfied the administrative appeals procedure called for under the plan, and therefore plaintiffs have exhausted all administrative remedies available to them under the Plan regulations.

■ 3. The "exhaustion of administrative remedies" called for by defendant is not required in the event such efforts would be futile. "An exact definition of futility is left to the sound discretion of the court as the facts vary from case to case." Plaintiffs have sent numerous letters to defendant demanding payment of their health benefits under the plan. Defendant absolutely ignored these letters. Even if these letters had not exhausted plaintiffs' available administrative remedies, defendant's continued refusal to respond to these letters clearly establishes that any further effort to obtain some administrative remedy in response to plaintiffs' claim for health benefits would be futile in this case.

### B. Arbitrary and Capricious Denial of Benefits in Violation of ERISA.

■ 4. This action involves claims for benefits under the Seafarers' Welfare Plan.

The action is governed, therefore, by ERISA, 29 U.S.C. § 1001 et seq., and applicable federal common law, and all state law claims and causes of action, if any, are preempted by ERISA.

5. The standard which this Court must apply under ERISA when reviewing defendant's denial of benefits to the McRaes is that such denial must be reversed if defendant's decision was arbitrary or capricious. *Thomas v. Gulf Health Plan, Inc.,* 688 F.Supp. 590 (S.D.Ala.1988). (hereinafter referred to as *Thomas* ). In applying the arbitrary or capricious standard, set forth in *Thomas*, the Court finds that the Plan did act in an arbitrary and capricious manner. Seafarers' Welfare Plan has subjected plaintiffs to costs and humiliation they would not have otherwise incurred.

### C. *Estoppel.*

6. Plaintiffs have further argued that the Plan should be estopped from refusing to honor their original representation to plaintiffs that a Tubal Reanastomosis would be covered. In view of what has heretofore been said, it is not necessary for this Court to reach that issue.

### D. *Extra–Contractual Relief.*

■ 8. Plaintiffs also claim that they are entitled to extra-contractual relief, attorney's fees and "any other appropriate equitable relief." Plaintiffs argue that this extra-contractual relief is available on two grounds: First under the civil enforcement provision of ERISA, 29 U.S.C. § 1132(a)(3)(B), which specifically provides for "other appropriate equitable relief." Second, plaintiffs claim extra-contractual relief on the basis of a federal common law claim of misrepresentation and bad faith.

9. The Court is satisfied, pursuant to the concurring opinion of Justice Brennan in the case of *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 155, 105 S.Ct. 3085, 3097, 87 L.Ed.2d 96 (1985), (hereinafter referred to as *Russell* ) that the *Russell* majority opinion did not preclude extra-contractual damages under 29 U.S.C. § 1132(a)(3) (or § 502(a)(3) of ERISA). As noted in *Russell,* "congress provided in § 502(a)(3) that beneficiaries could recover, in addition to the remedies explicitly set forth in that section, 'other appropriate equitable relief ... to redress' ERISA violations ... this additional provision can only be read precisely as authorizing federal courts to 'fine-tune' ERISA's remedial scheme." "The legislative history demonstrates that congress intended federal courts to develop federal common law in fashioning the additional 'appropriate equitable relief.'" Justice Brennan notes that the legislative history of ERISA clearly establishes that congress intended to engraft trust-law principles onto the enforcement scheme of ERISA. Justice Brennan makes the decisive statement upon which an award of extra-contractual damages in this case will stand: "A fundamental concept of trust law is that courts 'will give to the beneficiaries of a trust such remedies as are necessary for the protection of their interests.'" As a result of the Plan's violation under 29 U.S.C. § 1132(a)(3), the McRaes were forced to suffer the consequences of bad credit, and the humiliation of debt collectors knocking at their door at home and work. They have been unable to buy necessary personal items on credit and denied the right to purchase a home place. While this Court has already denied plaintiff any right to punitive damages, the aggravating circumstances in this action, considered in equity under ERISA, support an award of extra-contractual damages in the amount of $50,000.00.

### *Attorney's Fees*

■ 10. Plaintiffs have also claimed attorney's fees and costs under 29 U.S.C. § 1132(g) which provides: "In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." In *McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566 (11th Cir. 1985), the Eleventh Circuit Court of Appeals set forth several guidelines or factors repeatedly considered in awarding attorney's fees under ERISA. "These factors include: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an

award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position."

11. Under the first factor, the actions taken by the Plan, in changing its pre-verification, actually demanding reimbursement of funds previously paid under that verification, and then refusing to acknowledge repeated demands for reconsideration, establishes the level of bad faith necessary to support an award of attorney's fees. As to the second factor, there was no direct evidence as to the Plan's ability to pay attorney's fees, however, it is apparent that plaintiffs are not able to do so. As to the third factor, this Court concludes that an award of attorney's fees would be appropriate as a deterrent to future misrepresentations in the analysis of beneficiaries claims in general. As to the fourth factor, the McRaes were obviously seeking to gain their originally verified benefits however, in so doing they will hopefully benefit all participants and beneficiaries of this Plan in that other misrepresentations will be deterred. Further, this action resolves a significant legal question by establishing a right to extra-contractual damages under ERISA. Finally, as to the fifth factor, the merits of the McRaes' claim based on the telephone verification are obvious, while this Court is still at a loss as to what merits the Plan felt it had in a subsequent denial of previously verified benefits.

In accordance with the above Findings of Fact and Conclusions of Law, a Judgement will be entered forthwith.

### JUDGMENT

By a document bearing the same date as the date of this Judgment, this Court determined that plaintiffs in this action are entitled to recover damages from defendants as set forth below. It is ORDERED, ADJUDGED and DECREED as follows:

1. The Plan is enjoined from denying plaintiffs Vivion McRae and Paulette McRae benefits as verified by telephone on June 23, 1986, and is ordered to satisfy all outstanding medical bills on behalf of plaintiffs resulting from that verification in the total amount of $6,340.69;

2. That plaintiffs, Vivion McRae and Paulette McRae, shall have and recover the amount of $50,000.00 against defendant, Seafarers' Welfare Plan for extra-contractual damages;

3. Plaintiffs shall submit within ten (10) days from the date of this Judgment, an affidavit setting forth the actual attorney's fees and costs of this action for the Court's review pursuant to 29 U.S.C. § 1132(g).